```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MIEH, INC,

 4                   Plaintiff,

 5           v.                              19 CV 178 (JPO)

 6   TEKNO PRODUCTS, INC., et al.,

 7                   Defendants.

 8   ------------------------------x

 9   EVER VICTORY TECHNOLOGY
     LIMITED,
10
                     Plaintiff,
11
             v.                              19 CV 486 (JPO)
12
     SAS GROUP, INC.,
13
                     Defendant.
14
     ------------------------------x
15                                           New York, N.Y.

16                                           April 22, 2019
                                             11:45 a.m.
17
     Before:
18
                         HON. J. PAUL OETKEN,
19
                                             District Judge
20

21

22

23

24

25
```

1

2                                        APPEARANCES

3    EPSTEIN DRANGEL LLP
          Attorneys for Plaintiff Mieh
4    BY:  ROBERT L. EPSTEIN

5    STERN & SCHURIN LLP
          Attorneys for Defendant Tekno Products
6    BY:  RICHARD SCOTT SCHURIN

7    BISHOP DIEHL & LEE, LTD.
          Attorneys for Plaintiff Ever Victory
8    BY:  NICHOLAS LEE

9    HOFFMANN & BARON LLP
          Attorneys for Defendant SAS Group
10   BY:  MICHAEL I. CHAKANSKY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Case called)

2          THE COURT:  Sorry for the delay.  I'll have you each

3     state your appearance for the record in both cases.  I'm

4     treating them as potentially related for some purposes.  One is

5     Mieh v. Tekno Products, 19 CV 178.

6          Starting with plaintiff, please state your names for

7     the record.

8          MR. EPSTEIN:  Good morning Your Honor.  I'm Robert

9     Epstein from Epstein Drangel in Manhattan.  I represent the

10    plaintiff.

11         THE COURT:  And Defendant Tekno Products.

12         MR. SCHURIN:  Good morning, your Honor.  Richard

13    Schurin of Stern & Schurin, representing Tekno Products and Max

14    Deluxe Limited.

15         THE COURT:  Good morning.

16         The second case which we're doing together is Ever

17    Victory Technology Limited v.  SAS Group19 CV 486.

18         Counsel for plaintiff.

19         MR. LEE:  Good morning, your Honor.  Nicholas Lee

20    behalf of the plaintiff, Ever Victory Technology.

21         THE COURT:  And defendant SAS Group.

22         MR. CHAKANSKY:  Michael Chakansky, Hoffmann & Baron,

23    on behalf of SAS Group, Inc.

24         THE COURT:  Good morning.  Everyone, can remain

25    seated.  I do have a court reporter here for this.  Please just

pull the mikes toward you when you speak, but you can remain
seated.

One of these cases, the 19 CV 178 case was assigned to
me.  The other case, 19 CV 486, was originally assigned to
Judge Rakoff.  And I took the case on the theory that insofar
as it involved the same patent, there might be overlap.  I
wanted to make sure that steps would be taken to avoid any
inconsistent results and determinations in the cases.

Having said that, I haven't yet gotten into the case,
and the main reason I decided to have this conference is to get
a little background on where things stand because I know
there's a motion for preliminary injunction being briefed in
the 486 case and there's a motion for judgment on the pleadings
in the 178 case.

In the 486 case, Ever Victory, I know you appeared
before Judge Rakoff I believe.  He set an initial schedule, and
I'm now going to set a new schedule.  So I want to understand
what's at issue in the case.

I haven't yet delved into the motions that are pending
and/or being briefed.  So I would basically like a little
background on where things stand in each of the cases.  I'll
start with Mieh.

You can stay seated and speak into the microphone.

MR. EPSTEIN:  The case itself is a patent infringement
case.  The patent itself has to do with a toy that consists of

1    a series of tubes that can be joined together in various

2    configurations and a remote control vehicle, a little car, that

3    goes running through the tubes.  There is a remote control

4    which could control it.  That's basically the patent.

5        The claims, various sets of claims in the patent --

6    there is a set of claims that relates to how the tubes

7    interconnect, and there's a set of patents as to how the

8    vehicle is guided through the tubes.

9        THE COURT:  Who owns the patent?

10        MR. EPSTEIN:  Well, that's the interesting part of it.

11    The patent was assigned to a company called Ever Victory

12    Technology I think.  It is our position that we have an

13    exclusive right to exploit the patent.

14        THE COURT:  It's an exclusive license?

15        MR. EPSTEIN:  An exclusive license, yes, to exploit

16    the patent.

17        THE COURT:  From EVTL?

18        MR. EPSTEIN:  No.  Our agreement is with the sister

19    company of EVTL.  And the agreement specifically says that it

20    covers not only the sister company but all affiliates of that

21    company.  There is quite a bit of evidence that the sister

22    company and the patent assignee are affiliated companies.

23        THE COURT:  Okay.

24        Mr. Schurin, what's your story?

25        MR. SCHURIN:  My story is, your Honor, I represent a

company named Tekno who is a wholesaler.  They purchase

products primarily in the Far East and sell them in the

United States.  One of the prior defendants in this case was a

retailer by the name of Menard.

THE COURT:  Which has been dismissed.

MR. SCHURIN:  Which has been dismissed pursuant to an

agreement.  They agreed to stop selling the product, and the

plaintiff agreed to remove them from the case.  I also

represent Max Deluxe who is a Far East agent so to speak

involving the sale of the product.

So we were brought into the case as a purported patent

infringer.  We started looking at the patent and the claims and

noticed that of course the plaintiff wasn't the named assignee

and then found out from counsel in the other case that the

license, the exclusive license claim, was in dispute and is

in fact being litigated in Chicago in the Northern District of

Illinois, and it was brought to our attention.

THE COURT:  What's the status of the Northern District

of Illinois case, and who is the judge?

MR. SCHURIN:  We're not involved in that case.  I

believe counsel here might be able to better answer that

question.  I believe it's just ongoing.  In discovery is all I

know.  But I certainly defer to some of the others who are

involved in that case.

The extent of our investigation was to find out that

1     it was in serious dispute.  The claim that they were an

2     exclusive licensee was in fact hotly contested and litigated.

3          So we're in a quandary.  Who is the party that can

4     assert the rights against us.  So we've been involved in

5     cases –– I've had case with Mr. Epstein's firm before.  We've

6     always been able to amicably settle them.

7          We wanted to explore that.  My client certainly wanted

8     to explore that because patent cases can be extremely

9     expensive, especially involving toys such as this, and our

10    sales are not that great.

11         We can't really settle with one until we know who owns

12    the rights and who has the right to sue us because of course if

13    we were to settle with Mieh, we would still have exposure

14    potentially with the other, Ever Victory.

15         So all we could do is make the motion which is now

16    pending before Your Honor.  We believe they're an indispensable

17    party.  And in addition to being unable to settle, it's also

18    very wasteful, we believe, for us to go through discovery in a

19    patent case potentially with a party that doesn't have the

20    rights and then have to do that all over again.  So that's

21    basically our position.

22         THE COURT:  So your position is that discovery should

23    not start?

24         MR. SCHURIN:  Yes.

25         THE COURT:  Until the motion for judgment on the

1    pleadings is decided.

2              MR. SCHURIN:  Yes, your Honor.

3              THE COURT:  What's your position on that, Mr. Epstein?

4              MR. EPSTEIN:  I think that makes sense, your Honor.

5              THE COURT:  So you don't want discovery started

6    either?

7              MR. EPSTEIN:  I think that this initial motion is

8    extremely pertinent to this case, and it makes sense to me to

9    have it decided before we get into discovery.

10             THE COURT:  Before I get into the merits of the Ever

11   Victory Technology case, 19 CV 486, let me ask counsel, Mr. Lee

12   or Mr. Chakansky, if you can shed any light on what's going on

13   with the Northern District of Illinois case.

14             MR. LEE:  Yes, your Honor.  The case in the Northern

15   District of Illinois is before Judge Feinerman.  And the

16   parties just had an initial status conference about a week ago.

17   So discovery -- and Mieh just recently filed its counterclaims.

18   So our answer is coming due in a couple of weeks.

19             THE COURT:  So to be clear, the case is between Mieh

20   and Ever Victory?

21             MR. LEE:  It's between Ever Victory and Ever Right

22   against Mieh for, number one, breach of contract between Ever

23   Right and Mieh and for patent infringement between Ever Victory

24   against Mieh.

25             THE COURT:  So the two entities that start with "ever"

1    are Ever Victory and?

2              MR. LEE:  Right.

3              THE COURT:  Ever Right.

4              MR. LEE:  Yes.

5              THE COURT:  Those are the two allegedly affiliated

6    companies that Mr. Epstein mentioned?

7              MR. LEE:  That's correct.

8              THE COURT:  Are they affiliated?

9              MR. LEE:  They're sister companies.

10             THE COURT:  One of them purports to provide an

11   exclusive license, unbeknownst to the other one, to Mieh?  Or

12   is that contested?

13             MR. LEE:  Ever Right has an exclusive manufacturing

14   agreement with a company that's no longer in existence.  I

15   believe it's called Neatoh.  And Mieh was mentioned in that

16   agreement as a third-party beneficiary for the use of the toys

17   that Ever Right would manufacture for Neatoh.

18             Now my understanding is that Mieh has used that

19   agreement by default by inserting that they are a third-party

20   beneficiary to that agreement.  And as a result, they're saying

21   that they have a right to sue, wherein, the agreement does not

22   mention the asserted patent.  It does not mention the

23   application number or anything that has to do with this patent

24   itself.  Not to mention Ever Victory is not a party to that

25   agreement.

1           THE COURT:  What's the case number in the Northern

2    District of Illinois before Judge Feinerman?

3           MR. LEE:  I don't have that in front of me.

4           MR. SCHURIN:  I have it in my papers, your Honor.

5           THE COURT:  I guess it's probably in the papers.

6           MR. SCHURIN:  Your Honor, I have it at 19 CV 678.

7           THE COURT:  Thank you.

8           Is this issue teed up in the Northern District case?

9    "The issue" being whether Mieh has rights to assert claims of

10   patent infringement.

11          MR. LEE:  The issue is a breach of contract.  What

12   happened is Ever Right was to exclusively manufacture the toys

13   to Neatoh and manufacture the toys for over $250,000.

14          Apparently Neatoh transferred their assets over to

15   Mieh, and Neatoh is no longer in business.  They're saying that

16   they can't pay.  And Mieh -- although they're a third-party

17   beneficiary, they're saying that they don't have to pay for the

18   toys that they're selling.

19          So there is a breach of contract issue involved.  And

20   Ever Victory, is asserting patent infringement against Mieh

21   because they don't have a right to sue or a right to sell the

22   production because now that we've terminated the agreement back

23   in January of this year.

24          THE COURT:  So will that effectively decide whether

25   Mieh can assert these claims versus Ever Victory Technology

being able to assert the claims?

        MR. LEE:  I can't quite answer that.  I don't know.
But indirectly, it could.

        THE COURT:  Okay.  Mr. Chakansky, is there anything
you want to add?

        MR. CHAKANSKY:  I'm not in the Northern District of
Illinois case.

        THE COURT:  Sorry?

        MR. CHAKANSKY:  I'm not in the Northern District of
Illinois case.  I'm just SAS in the this case, the 486 case.  I
think Mieh is represented by that gentleman.

        THE COURT:  So SAS is not in that case?

        MR. CHAKANSKY:  We are not in that case.

        THE COURT:  Mr. Epstein, is there anything that you
can tell me more about the Chicago case?

        MR. EPSTEIN:  Well, I can tell you that we have some
factual disagreements with what Mr. Lee said.  The agreement in
question specifically and explicitly grants the rights under
the patent for this technology.

        THE COURT:  And it names the patent?

        MR. EPSTEIN:  It does not indicate the patent number,
but it does say all rights under the patent as part of the
exclusive license, those rights being in the United States and
Europe.

        THE COURT:  Is this attached to the motion for

1    judgment on the pleading?

2              MR. EPSTEIN:  I'm sorry?

3              THE COURT:  Is this in the briefing for motion on the

4    judgment in the pleading?

5              MR. EPSTEIN:  A hundred percent, yes.  It's all laid

6    out, all the facts, there.  The copy of the agreement is there.

7    Obviously our view what the agreement means and what our rights

8    are under the agreement.

9              THE COURT:  What can you tell me about whether the

10   Northern District case is likely to resolve this issue before

11   me about who can assert the patent?  In other words, maybe

12   there is reason for me to coordinate with Judge Feinerman and

13   stay my case until he decides his or something like that.

14             What's your view on that?

15             MR. EPSTEIN:  I believe that that case should clarify

16   who has the rights here.  We've just filed our answer I think

17   last week in that case.  There are counterclaims.

18             We are also joining as a third party the parent of the

19   two sister companies in the Chicago case because of certain

20   actions that the parent has taken, including trying to purchase

21   the assets for the party to the agreement which is called

22   Neatoh.

23             That company made an assignment to creditors of its

24   assets, and both TL and EVT -- both of them tried to purchase

25   the assets unsuccessfully.

1          THE COURT:  Is there any reason I shouldn't transfer

2    this case to the Northern District of Illinois and have it all

3    in one proceeding?  I don't know if there is personal

4    jurisdiction there.

5          MR. EPSTEIN:  In terms of Mieh, we are located in

6    Chicago.  So there is no issue in terms of that.  I can't see

7    any reason why you could not transfer that case.

8          THE COURT:  What do the others think?  You're in the

9    Chicago area.

10          MR. LEE:  I'm in Chicago.  SAS I believe is in

11    New York.

12          MR. CHAKANSKY:  SAS is in New York, and there is no

13    venue there.

14          THE COURT:  There is no venue there?

15          MR. SCHURIN:  Tekno is in New Jersey.  I thought about

16    this a little bit, your Honor.  I'd just like to throw out a

17    suggestion.  I think it might be best to put this on the

18    suspense docket maybe and see what happens in the case in

19    Chicago.

20          It would seem to be inefficient and very costly to my

21    client even to go to initial conferences and make a venue

22    motion.  The same result would be achieved.  Presumably he's

23    going to stay it until he decides the ownership issue there.

24    So we can just as easily sit and wait here as we can there.

25          THE COURT:  As to the Mieh case, that might be

1    plausible.  In the other one I have a PI motion pending.

2             Let me start with Mr. Epstein.  Are you okay with

3    staying this case pending something that would be helpful to

4    resolution from the Chicago case?  Or would you rather not?

5             MR. EPSTEIN:  No.  I actually think that would make

6    sense, your Honor.

7             THE COURT:  To stay this one.

8             MR. EPSTEIN:  To stay it, yes, or to transfer it,

9    either one.  We don't really care that much.  Obviously there's

10   an inconsistency here in terms of who has the right to enforce

11   the patent.  In the SAS case, if you were to find that that

12   case could go forward, that would kind of put us in limbo I

13   guess.

14            THE COURT:  I don't know that I'll be in a position to

15   grant a preliminary injunction when it's not even clear that

16   Ever Victory can assert the patent.

17            So, Mr. Lee, what do you think about staying your case

18   as well?

19            MR. LEE:  Well, we were not even aware of Mieh having

20   actually asserted a patent suit in this court.

21            THE COURT:  Until now?

22            MR. LEE:  Until we filed the suit against SAS.  We

23   were very surprised when we found out because, number one, Ever

24   Victory is the named owner of the patent on its face.  They

25   have the recordation of assignment before the patent office.

1          The agreement that they're asserting as a reason for

2     asserting the patent by Mieh does not mention the patent, and

3     Ever Victory is not a party to that agreement.  So as much as

4     Mieh is asserting that they have a right to sue, the case law

5     is very clear.  It has to be expressly stated in the agreement.

6          Here, Ever Victory is not even a named party to the

7     agreement.  And yet they're asserting that somehow they're

8     affiliated with Ever Right.  So they must have acquiesced to

9     the right to sue I believe is a stretch argument.

10          But having said that, we brought the preliminary

11     injunction motion for a reason.  SAS is selling the accused

12     toys, and that is hurting our client's ultimate business.

13     Because of the price erosion of the toys, time was of the

14     essence.  That was the main reason why we had to bring this

15     preliminary injunction motion when we did.

16          THE COURT:  Mr. Chakansky, do you want to respond?

17          MR. CHAKANSKY:  Yes.  As to background as well, SAS

18     Group is a marketer.  They find products, they approve them,

19     they sell them, and they market them very well.

20          One of the products they found was a toy game, play

21     pattern, where you had a track that was closed, and you had a

22     race car around it.  And they looked at it.  There was no

23     patent.  They went ahead and approved it and sold it very well.

24     In 2018, it constituted 50 percent of their sale.  It's half

25     their business.

16

1          In May of last year --

2          THE COURT:  Sorry.  Half of whose business?

3          MR. CHAKANSKY:  My client's business is the sales of

4     their -- we call them zoom tubes.

5          THE COURT:  Zoom tubes?

6          MR. CHAKANSKY:  Zoom tubes.

7          THE COURT:  That's half of SAS' business?

8          MR. CHAKANSKY:  In 2018.  It's seasonal.  In May of

9     last year, Mieh sent a cease and desist to SAS.  We have a

10    bundle of IT, including the '212 patent.

11         In October, cease and desist letters from Ever Victory

12    and Ever Right together were sent to our purchasers, Wal-Mart

13    and Target.  We responded and said we don't infringe.  So we

14    had cease and desist letters from both parties, actually, three

15    parties.

16         Additionally, we learned that Ever Right, Ever Victory

17    are so-called sister companies who are owned by Sunlee Group,

18    the head of whom happens to be the inventor on the patent.

19         And the Sunlee Group happens to be -- I might disagree

20    with counsel there -- the manufacturer of the product.  Ever

21    Right is a distributor.  Ever Victory is merely the patent

22    holder.

23         We think it's premature at this stage in the beginning

24    until the ownership -- who we have to deal with, if we have to

25    deal with Ever Victory, if we have to deal with Mieh, we have

1    to deal with both -- it makes no sense to get into settlement

2    discussions if we don't know who we have to deal with.

3         Additionally, we were on a very aggressive schedule

4    under Judge Rakoff.  We've done a lot of things already.  The

5    answer has been filed.  The answer to the counterclaims has

6    been filed.  We have almost completely briefed the PI motion.

7    Ever Victory has gone ahead and taken discovery of our

8    president.  We've taken Ever Right's salesperson.  They've

9    taken our expert.

10        A lot of things have gone on, and it has been very

11   costly to our client, as well as the fact that we have hanging

12   over us the preliminary injunction motion which, if it was

13   granted, which we don't think it should be, would really hurt

14   my client's business.

15        THE COURT:  So they're still selling the toy?

16        MR. CHAKANSKY:  They're still selling it.

17        THE COURT:  And Mieh has not brought suit against SAS?

18        MR. CHAKANSKY:  No.  Only the cease and desist letter.

19        THE COURT:  So what's your proposal?  You think I

20   should decide the PI motion and not stay it?

21        MR. CHAKANSKY:  I think you should stay our case.

22        THE COURT:  You think I should stay it?

23        MR. CHAKANSKY:  Stay it until the alleged asserters of

24   the patent figure out which one it is.

25        THE COURT:  Three out of four of you said I should

1    stay it.  If we were taking a vote, I would stay it.  But

2    Mr. Lee disagrees.

3        MR. SCHURIN:  Your Honor, can I clarify my position a

4    little bit.  I believe that the motion to dismiss that we made

5    on the pleadings should be granted as opposed to a stay because

6    it's clear the plaintiff, Mieh, does not have an uncontested

7    exclusive license.

8        And I believe the law is that for an exclusive

9    licensee to have standing to sue, it has to be established.  It

10   can't be contested.  That's the point of our motion, that, yes.

11   An exclusive licensee.  Assuming that their rights were clear

12   as day, yes, they would have standing.

13       But in this case, they clearly don't.  Under the law,

14   they just don't have standing to maintain an action until that

15   is established.  So sort of you can look at it if you wanted to

16   decide the standing issue first, we think you should get rid of

17   this case.  It can be dismissed without prejudice.  It doesn't

18   have to be stayed.  Then whoever is the victor can decide

19   whether or not to recommence it.

20       THE COURT:  So you don't want me to stay it.  You want

21   me to decide the motion first.

22       MR. SCHURIN:  That would be my first option.  I'm

23   sorry if I was unclear before.  The papers were fully

24   submitted.  It's basically a legal point.  The facts are not in

25   dispute.

1          When your Honor asked before whether or not the

2     ownership issue was briefed in the motion, it really isn't.

3     They offered a bunch of evidence, but we're not in a position

4     to participate in that.  We actually objected to the

5     introduction of all this evidence because it goes well beyond

6     the pleadings.

7          THE COURT:  You're just relying on the legal principle

8     that it has to be essentially an uncontested ownership and

9     saying that gives rise to a standing defense.

10          MR. SCHURIN:  Yes.  The law is that normally only the

11     assignee can sue.  There is an exception for an exclusive

12     licensee.

13          THE COURT:  But it's a motion for judgment on the

14     pleadings.  All they have to do is allege that there is enough

15     factually to establish standing I would think.

16          You're saying they haven't alleged enough?

17          MR. SCHURIN:  They haven't alleged enough of it, and

18     the law is that they have to allege that they are -- they have

19     an uncontested exclusive license.  And they've admitted that

20     they can't allege that.  So in that case, there's a lack of

21     standing.

22          THE COURT:  It just seems odd to me that you want me

23     to work out these disputes about ownership when there is a

24     judge in Chicago who's going to be deciding these issues.

25          MR. SCHURIN:  My position is your Honor doesn't need

1    to decide those.  It's uncontested that there is a dispute.  So

2    long as there's a dispute, they don't have standing.  They're

3    not an uncontested exclusive licensee.  That's our position.

4         THE COURT:  So you want me to decide the motion for

5    judgment on the pleadings.

6         I guess you're okay with that as well?

7         MR. EPSTEIN:  Yes, I am, your Honor.

8         THE COURT:  And then we'll go forward from there.  In

9    the meantime, there shouldn't be discovery in the Mieh case I

10   believe because that decision -- I may decide to stay the case,

11   or I may just decide the motion for judgment on the pleadings.

12   In either case, I won't have you do discovery I guess.

13        Is Mieh going to be engaged in discovery already in

14   the Illinois case?

15        MR. EPSTEIN:  Well, as I said, it's still in the

16   pleadings stage.  Clearly once the pleadings are over, we will

17   be undertaking discovery in that case.

18        THE COURT:  Isn't there a discovery schedule already?

19        MR. EPSTEIN:  Yes.  Actually, I do think in the last

20   hearing -- I did not attend.  Local counsel did.  Yes.  I think

21   there is a schedule in that case, your Honor.

22        THE COURT:  I'll have to look at the papers before I

23   decide anything.  I don't know how realistically I'm going to

24   grant a preliminary injunction when there is a serious issue

25   about who has the rights to assert this patent.

1          I guess you're saying it's not a serious issue.

2     You're saying it's pretty clear?

3          MR. LEE:  It's abundantly clear in my opinion.  I

4     understand that counsel is disagreeing with certain facts, but

5     if your Honor will look at the papers that are before you,

6     you'll note that the agreement does not mention Ever Victory

7     who is the patent owner.  And Ever Victory and Ever Right does

8     not have any assignment where Ever Right has the right to

9     assign or give right to sue to somebody else.  There is no such

10    agreement in existence.

11         One additional thing to mention.  At the time the

12    agreement was executed, the patent that is being asserted in

13    this case was still penned being.  So there was never a mention

14    about the patent.  So for Mieh to assert that they have a right

15    to sue based on the agreement -- it's nonsensical to me,

16    your Honor.

17         THE COURT:  Who is listed as the owner of the patent?

18         MR. LEE:  Ever Victory.

19         THE COURT:  So what's your position in the Ever

20    Victory case as to discovery?  I gather you've engaged in

21    discovery already.

22         Is there currently a deadline for fact discovery?

23         MR. EPSTEIN:  Yes.

24         THE COURT:  So Judge Rakoff set a schedule for

25    discovery?

1          MR. EPSTEIN:  I think it's in June.

2          MR. LEE:  We submitted an amended discovery schedule,

3    and we proposed that all discovery to be completed by

4    October 24, 2019.

5          MR. CHAKANSKY:  On the other hand, it's been SAS's

6    position that discovery should not occur while the issue of

7    standing is still out there.  It's a big expense for my client.

8          THE COURT:  So you want no more discovery to happen?

9          MR. CHAKANSKY:  Yes, until it gets resolved one way or

10   the other.

11         THE COURT:  How would it get resolved?

12         MR. CHAKANSKY:  From the Northern District of Illinois

13   case presumably.

14         THE COURT:  And your position is go forward with

15   discovery under the October schedule.

16         MR. LEE:  I believe that discovery should proceed, and

17   at the same time the issue of standing that is brought to your

18   attention in the other case should be decided because I believe

19   that SAS is using that as a buffer to not only engage in

20   discovery but to even talk settlement.

21         So it's our position that the issues become very murky

22   right now, but at the same time the paper is very clear.  Mieh

23   does not have the right to sue.  Let alone there was never an

24   agreement between Ever Victory and Mieh for anything to do with

25   the asserted patent in this case.

1      THE COURT:  Have you all read the motion for judgment

2  on the pleadings filed in the other case?

3      MR. LEE:  I've read defendant's side.  I have not yet

4  read plaintiff's response.  I just read the declaration by one

5  of the principals in that case.

6      THE COURT:  Remind me what we set for the preliminary

7  injunction hearing.

8      MR. LEE:  The preliminary injunction hearing had been

9  adjourned.  It has not been set since then.

10      MR. CHAKANSKY:  The reply is due the 26th currently,

11  April 26, at which time it will be complete.

12      THE COURT:  Then it will be fully briefed?

13      MR. CHAKANSKY:  Yes.

14      THE COURT:  So I think I'm going to take a look at the

15  papers first before I figure out what to do with this not

16  tricky issues because I think I need to take look a little bit

17  at the agreements to assess these ownership issues and then

18  also look at the PI papers, when they're fully briefed, to

19  determine whether and when to set a hearing for that.

20      In the meantime, have you been doing discovery in the

21  last few weeks?

22      MR. LEE:  Other than the discovery for preliminary

23  injunction, the parties have exchanged written discovery.  The

24  parties have agreed to exchange and produce documents the first

25  week of May.

1          MR. CHAKANSKY:  Yes.  The current requests are due the

2     first week of -- responses to the first request are due the

3     first week of May.  If we had an opportunity to stay that

4     pending a decision whether to go ahead, that would be cost

5     saving for my client if we could stay the responses.

6          THE COURT:  If you could save the responses?

7          MR. CHAKANSKY:  I'm sorry.  Stay, until we get a

8     decision from your Honor whether you're going to hold a hearing

9     on the preliminary injunction, whether you're going forward

10    with that.

11         THE COURT:  Did you want to add something?

12         MR. LEE:  Yes.  The concern that we have right now --

13    I know this issue is not in front of you, but with respect to

14    discovery, the president of SAS does not even know who

15    manufacturers their own toys.  We need that information as part

16    of our discovery and part of the preliminary injunction.  If we

17    don't have that, the discovery gets preemptively stayed.

18         Again, we just feel that the issue of standing is the

19    reason why they don't want to participate or try to delay

20    discovery, and I think that it should be -- as far our case, at

21    least discovery should continue.

22         MR. CHAKANSKY:  I would have to disagree with some of

23    that.  We've been very cooperative with discovery.  We filed

24    our opposition to the preliminary injunction motion.  We had

25    our client, the president, give a declaration and an expert.

1  We provided both of them for their depositions within a week so

2  that they could be done in a timely fashion.

3         We have cooperated.  The fact that our client doesn't

4  know offhand who the agent he uses in China uses for the

5  manufacturing shouldn't stand in the way of their program for

6  discovery here.

7         THE COURT:  Why is it so important to know the

8  manufacturer for the PI motion?

9         MR. LEE:  Because we believe that the manufacturer --

10  our intent is to engage in another lawsuit in China if we find

11  out who the manufacturer is.

12         THE COURT:  Another lawsuit in China?

13         MR. LEE:  Because they're being manufactured and

14  imported and shipped to the U.S.  And our client is adamant

15  that we need to stop it.

16         MR. CHAKANSKY:  If that is the only thing to stay our

17  discovery, I can get my client, if he can find out who it is,

18  to provide him that information.

19         THE COURT:  Why don't do you that.  Other than that,

20  I'm going to stay further discovery, unless it's crucial, to

21  the PI motion, but I'll hold you to the representation that

22  you'll provide that information, pending further order because

23  I want to try to think about this and sort through the best way

24  to do it.

25         The easiest way to do it would be to get a global

1    settlement that somehow resolves this issue which would have

2    Mieh and Ever Victory/sister and parent get together and reach

3    some deal as to whatever, dividing the right to assert the

4    patent, so that it would be clear.  And then you can resolve

5    this.  I gather there is not much interest at this point.

6              Did Judge Feinerman ask about that?

7              MR. LEE:  Well, Judge Feinerman was having a hard time

8    getting the facts --

9              THE COURT:  Getting what?

10             MR. LEE:  Getting the facts squared away because now

11   they're asserting civil conspiracy.

12             THE COURT:  Who is asserting that?

13             MR. LEE:  Mieh is asserting civil conspiracy, and

14   we're still trying to wrap that around our head to see what

15   that's about.  So it's still premature.

16             THE COURT:  Is there anything anyone else wants to

17   add?

18             MR. LEE:  One more thing, Judge.  If I can get a date

19   certain for counsel to provide me with that information of who

20   the manufacturer is, that would be great.

21             MR. CHAKANSKY:  As soon as I call my client, I will

22   ask him to try to figure it out.  From the paperwork that we

23   had in the deposition, it looks like he should be able to

24   figure out who it is.

25             THE COURT:  Try to get it by May 3.

1      MR. CHAKANSKY:  Absolutely.

2      THE COURT:  Great.  Other than that, I'm going to take

3  the matter under advisement in terms of how to go forward.

4  I'll let you know what I've decided in terms of whether and how

5  we will go forward or not.

6          Is there anything else anybody wants to address today?

7      MR. CHAKANSKY:  Just one thing.  If we go forward in

8  discovery in the future if the case is not stayed, we have

9  three entities we're dealing with, all located in Hong Kong or

10  China.  We're probably going to need -- they're all related.

11  Their declarant was from Ever Right --

12      THE COURT:  You're talking about --

13      MR. CHAKANSKY:  Ever Right is one of the sister

14  companies.  The declarant and the PI motion was from a sister

15  company dealing with irreparable injury.

16      THE COURT:  You're talking about Ever Victory being

17  from China?

18      MR. CHAKANSKY:  Ever Victory is in Hong Kong; Ever

19  Right is in Hong Kong; and the Sunlee Group, the parent; is I

20  believe in China, but it could be Hong Kong.  I'm not sure.

21  I'm just saying there will be a lot of what seems to be

22  third-party discovery coming from China.

23      THE COURT:  And Mieh is based where?

24      MR. EPSTEIN:  In Chicago.

25      THE COURT:  Chicago.  All right.  Fair enough.

1   Anything else for now?  Okay.  Great.

2              It would be helpful to have the transcript.  So I'd

3   ask you to order this transcript and divide it four ways.  Can

4   you do that?

5              MR. CHAKANSKY:  Sure.

6              THE COURT:  Thanks, everybody.  We're adjourned.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25