UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EVER VICTORY TECHNOLOGY
LIMITED,

                         Plaintiff,

              -v-

SAS GROUP, INC.,

                         Defendant.

19-CV-486 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

     In this action filed under the U.S. Patent Act, 35 U.S.C. § 1 *et seq.*, Plaintiff Ever Victory Technology Limited ("Ever Victory") alleges that a toy product sold by Defendant SAS Group, Inc. ("SAS") infringes a patent that Ever Victory has the right to enforce. Now before the Court is Ever Victory's motion for a preliminary injunction that would bar SAS from selling the offending product during the pendency of this lawsuit. (Dkt. No. 22.) For the reasons that follow, Ever Victory's motion is denied.

**I.    Background**

     Ever Victory, a Hong Kong company that distributes a toy car-racing kit called Rocket Wheels, is the original assignee of U.S. Patent Number 9,731,212 (the "'212 Patent"). (Dkt. No. 1 ("Compl.") ¶¶ 1, 8–9; *see also* Dkt. No. 1-1 ("Patent").) That patent describes "a toy track system and a toy vehicle for moving therein" and sets forth claims that create rights in certain track and vehicle designs. (Patent col. 1:4–5; *see also id.* col. 9:8–29, 10:4–39, 10:62–12:17.)

     On January 17, 2019, Ever Victory filed this lawsuit against New York company SAS. (Compl. ¶ 2.) According to the complaint, SAS sells a product called Zoom Tubes Car Tracks ("Zoom Tubes") that infringes three of the '212 Patent's claims. (Compl. ¶¶ 10, 14.) Claiming that SAS has willfully violated the Patent Act by selling Zoom Tubes, *see* 35 U.S.C. § 271(a),

Ever Victory seeks, among other things, an injunction that would bar SAS from making, selling, or using any infringing products and that would require SAS to destroy its inventory of, and any promotional materials related to, such products.[1] (Compl. ¶¶ 16–22; *see also id.* at 13.)

Several weeks after filing this lawsuit, on February 28, 2019, Ever Victory moved for a preliminary injunction that would bar SAS from selling Zoom Tubes during the pendency of this litigation. (Dkt. No. 22.) At an April 22, 2019 conference, this Court stayed discovery in this matter pending its resolution of the preliminary injunction motion. (Dkt. No. 50 at 25:19–27:5.) That motion has now been fully briefed (Dkt. Nos. 26, 33, 46), and the Court is prepared to rule.

## II.     Legal Standard

Preliminary injunctions are "extraordinary remed[ies] never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As such, a party seeking a preliminary injunction bears the burden of demonstrating "(1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). Although "[t]hese factors, taken individually, are not dispositive," *id.* (quoting *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988)), Federal Circuit case law establishes that "a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm," *id.*[2]

---

[1] SAS answered the complaint and asserted several counterclaims on March 6, 2019. (Dkt. No. 27.) Ever Victory answered SAS's counterclaims on April 4, 2019. (Dkt. No. 38.)

[2] Because this case "aris[es] under the patent laws," this Court applies Federal Circuit precedent. *Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.*, 138 F. Supp. 3d 303, 314 (S.D.N.Y. 2014) (quoting *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 475 (Fed. Cir. 1991)); *see*

**III. Discussion**

The Court begins its discussion of the preliminary injunction factors by considering Ever Victory's likelihood of success on the merits of its patent claims. The Court then asks whether Ever Victory has shown that it will suffer irreparable harm absent a preliminary injunction.

**A. Likelihood of Success on the Merits**

Ever Victory alleges that Zoom Tubes infringes claims 4, 10, and 20 of the '212 Patent. (Compl. ¶ 17.) To establish a likelihood of success on the merits, Ever Victory must show that it is "more likely than not" that the product does indeed infringe at least one of these claims.[3] *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012). Each asserted claim contains several limitations that define its protective scope, and "[t]o prove [Zoom Tubes] literally infringes the patent in suit," Ever Victory must show that Zoom Tubes "contain[s] each and every limitation of the asserted claim[s]." *Trebro Mfg., Inc. v. Firefly Equipment, LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014). The Court considers each of the three asserted claims in turn.[4]

---

*also Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525 (Fed. Cir. 2012) (explaining that Federal Circuit law governs a preliminary injunction motion targeting patent infringement).

[3] Although SAS has in its counterclaims challenged the validity of selected '212 Patent claims (Dkt. No. 27 at 19–22), it has not asserted any invalidity contentions in connection with the present preliminary injunction motion (*see* Dkt. No. 46 at 5 n.2). For present purposes, then, the Court assumes the validity of the '212 Patent claims asserted by Ever Victory.

[4] The Court notes that the scope of Ever Victory's right to enforce the '212 Patent is presently being disputed in an action proceeding in the Northern District of Illinois. *See Everite Transworld Ltd. v. MIEH, Inc.*, No. 19 Civ. 678 (N.D. Ill.). Because the Court concludes for independent reasons that Ever Victory has not demonstrated a likelihood of success on the patent claims it has raised in this action, the Court need not and does not address whether Ever Victory has shown that it is likely to establish its authority to bring this infringement action in the first place.

### 1. Claim 4

Claim 4 of the '212 Patent describes a toy track system made up of tube sections capable of being connected end to end. (Patent col. 9:8–29.) To come within the scope of the patent, a toy track system must contain, among other things, "a connection module comprising:

> coupling means having first and second coupling parts which are provided on the first and second tube sections respectively and are inter-engageable with each other to prevent axial separation between the first and second tube sections;
>
> and interlocking means having first and second interlocking parts which are provided on the first and second tube sections respectively and are inter-engageable with each other to fix the first and second tube sections in one predetermined angular position relative to each other selected from at least two predetermined angular positions
>
> wherein the connection module includes first and second sleeves on which any of the first and second coupling parts are supported respectively, and
>
> wherein the connection module includes a third sleeve on which there is provided corresponding first and second coupling parts for inter-engaging the first and second coupling parts on the first and second sleeve.

(Patent col. 9:11–29.) Ever Victory argues that it will likely succeed in showing that the Zoom Tubes product embodies these limitations. (Dkt. No. 26 at 2.) To assess that argument, the Court undertakes a two-step analysis, first "determin[ing] the scope and meaning of the patent claims asserted" and then comparing "the properly construed claims . . . to the allegedly infringing device." *Oakley, Inc. v. Sunglass Hut In'tl*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) (quoting *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc)).

The Court turns first to the question of claim construction. Ever Victory maintains that "the toy car and track system of the '212 Patent is relatively simple such that claim terms should be construed using their plain and ordinary meaning consistent with the patent specification." (Dkt. No. 26 at 2–3.) SAS, in contrast, has filed expert testimony from Dr. Glenn E. Vallee, a

professor of mechanical engineering, that offers specific constructions for portions of the claim language at issue here. (Dkt. No. 35 ("Vallee Decl.").) Ever Victory never challenges Vallee's credentials or disputes any of the specific constructions he has provided, so the Court tentatively accepts Vallee's construction of the relevant claim language. *See Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996) ("[T]he trial court has no obligation to interpret [a claim] conclusively and finally during a preliminary injunction proceeding.").

The Court next proceeds to ask whether Ever Victory is likely to show that the Zoom Tubes product fits within the claim language, as Vallee has construed it. For purposes of this analysis, the Court separately considers three features that a product's connection module must contain in order to fit within the claim language quoted above: (1) a coupling means; (2) an interlocking means; and (3) a third sleeve containing coupling parts.

### a. Coupling Means

To fit within the claim language, the mechanism for connecting any two tubular track sections of the Zoom Tubes product must contain "coupling means having first and second coupling parts which are provided on the first and second tube sections respectively and are inter-engageable with each other to prevent axial separation between the first and second tube sections." (Patent col. 9:12–16.) And in Vallee's understanding, "coupling parts" in the mechanical engineering context refers to "parts which inter-engage in order to couple each other together." (Vallee Decl. ¶ 17.)

Ever Victory argues that Zoom Tubes embodies this limitation because there is a raised projection at the end of each tube section contained in the Zoom Tubes kit. (Dkt. No. 26 at 5.) According to Ever Victory, "[t]he first and second coupling parts are located on . . . the left and right vertical surfaces of the projections on each tube section." (*Id.*) SAS, though, rejects the

5

idea that "[o]pposite surfaces of a single 'projection'" can satisfy the claim language because they "cannot simultaneously be located at both 'first and second tube sections'" and because "it is physically impossible for the left vertical surface of the projection . . . to be 'inter-engageable' with the right vertical surface of the same projection." (Dkt. No. 33 at 12–13.)

The Court concludes that SAS has the better of this argument. Naturally understood, a "coupling means" consisting of two components that are "inter-engageable with each other" to prevent the separation of the objects on which they are "respectively" located (Patent col. 9:12–16), hardly encompasses a single protrusion that does not consist of two separable component parts and that does not, by itself, prevent the separation of any two objects. As Vallee puts it, "the tab must engage with *another* component in order to restrain axial motion" between the tube section on which it is located and another tube section. (Vallee Decl. ¶ 37 (emphasis added).) And to the extent that Ever Victory argues that the supposed "first coupling part" (*i.e.*, the left side of the projection) on one tube section is "inter-engageable" with the supposed "second coupling part" (*i.e.*, the right side of the projection) on a second tube section, SAS has presented unrebutted evidence that Zoom Tubes' tube sections have equal diameters, such that it would be impossible for one tube section's projection to inter-engage with another's. (Vallee Decl. ¶ 18.)

Ever Victory's rejoinders are unpersuasive. Principally, Ever Victory relies on language in the patent specification that, it says, "specifically refutes SAS's position." (Dkt. No. 46 at 2.) In relevant part, the cited language states that "[t]he first surface of the projection or protrusion" at issue "may include a pair of opposite first surfaces" (Patent col. 5:40–41), which Ever Victory apparently takes to mean that that both coupling parts may be located on a single projection. But even accepting this reading of the specification, the fact remains that those parts must be "inter-engageable with each other to prevent axial separation between" two tube sections to fall within

6

the claim language. (Patent col. 9:14–15.) And, again, SAS has presented unrebutted evidence that the surfaces of the projection at issue in the Zoom Tubes product cannot come into contact with, let alone inter-engage with, one another or with the projection of an adjacent tube section.

Undaunted, Ever Victory offers two arguments as to how inter-engagement might occur. First, it argues that "separate surfaces of the same projection are necessarily inter-engaged and thus inter-engageable with each other." (Dkt. No. 46 at 3.) But even if the Court overlooks the dubious logic of treating dual surfaces that are inextricably "inter-engag*ed*" as therefore "inter-engage*able*," the inter-engagement described in claim 4 must "prevent axial separation between" two separate tube sections. (Patent col. 9:15.) And the inevitable "inter-engagement" of two surfaces of a projection located on a single tube section does not, by itself, function to join that section with another. Second, Ever Victory argues that the surfaces of the projections on two adjoining tube sections might indirectly become inter-engaged with one another if, as they do in the Zoom Tubes product, both projections separately engage with a third component: namely, a connective sleeve that can fit over the adjacent ends of any two tube sections. (Dkt. No. 46 at 3.) But absent any contrary evidence, the Court rejects Ever Victory's expansive reading of inter-engagement and concludes that the inter-engagement of two coupling parts is more naturally understood to require that those two parts couple directly by physically contacting one another.

The Court therefore concludes that Ever Victory has not carried its burden of establishing a likelihood that the Zoom Tubes product contains the coupling parts described in claim 4.

### b. Interlocking Means

In addition to containing the coupling parts described above, a product's tube sections must contain an interlocking means to fall within claim 4 of the '212 Patent. That interlocking means, more specifically, must have "first and second interlocking parts which are provided on

7

the first and second tube sections respectively and are inter-engageable with each other to fix the first and second tube sections in one predetermined angular position relative to each other selected from at least two predetermined angular positions." (Patent col. 9:16–22.) Turning again to the projection discussed above, Ever Victory argues that "the top and bottom surfaces" of the projection constitute the claimed first and second interlocking parts. (Dkt. No. 26 at 5–6.)

This argument meets the same fate as Ever Victory's comparable argument regarding the coupling parts. Again, even assuming that two surfaces of a single projection can constitute the claimed interlocking parts, Ever Victory fails to grapple with the fact that, in the Zoom Tubes product, the opposing surfaces of a projection located on one tube section are incapable of inter-engaging with one another or—given that all tube sections have identical diameters—with any surface of a second tube section's projection. Here too, Ever Victory attempts to rely on the fact that two Zoom Tubes track sections can be connected end to end by way of a separate connective sleeve. (Dkt. No. 26 at 6.) But as explained above, the Court is unpersuaded at this stage that the use of a third connective part satisfies the relevant limitation's requirement that the claimed interlocking parts be "inter-engageable with *each other*." (Patent col. 9:19 (emphasis added).)

What is more, even if the Court were inclined to agree that the requisite inter-engagement between two interlocking parts can occur indirectly through a third part, SAS has supplied reason to doubt that this so-called inter-engagement, as embodied in Zoom Tubes, "fix[es] the first and second tube sections in one predetermined angular position relative to each other," as claim 4 requires. (Patent col. 9:19–21.) As Vallee understands the relevant language, claim 4 requires that "once [two] tube sections are joined, they cannot rotate about their respective longitudinal axes with respect to each other (unless, of course, they are disassembled)." (Vallee Decl. ¶ 25.) But SAS's unrebutted evidence indicates that even after two of Zoom Tubes' track sections are

8

linked up by way of a third connective piece, the track sections remain capable of "rotat[ing] over an infinite number of angular positions" with respect to one another. (Vallee Decl. ¶ 26.)

Ever Victory gives no adequate response. In essence, it argues that nubs contained on the third connective piece, which serve as "reference locations for setting the angular position of two tube sections relative to each other at approximately diametrically opposed positions" (Vallee Decl. ¶ 39), serve to "fix the first and second tube sections in at least two predetermined angular positions," even if "sufficient pressure can overcome the fixation" (Dkt. No. 46 at 4). But this argument ignores unrebutted evidence that the projections on Zoom Tubes' tube sections "can easily pass over the nubs" on the third connective piece, thus allowing the track sections "to be rotated at any angle." (Vallee Decl. ¶ 39.) Besides, even if the nubs on the connective piece *did* fix the positions of the tube sections connected by that piece, Ever Victory has not cited the nubs (rather than the opposing surfaces of the tube sections' projections) as one of the interlocking parts that, under the claim limitation at issue, must inter-engage "to fix the first and second tube sections in one predetermined angular position relative to each other." (Patent col. 9:19–21.)

As with the coupling means, then, the Court concludes that Ever Victory has failed to carry its burden of establishing that the Zoom Tubes product likely contains the interlocking means described in claim 4 of the '212 Patent.

### c. Third Sleeve Containing Coupling Parts

Finally, the limitations of claim 4 are satisfied only if a track system has "a third sleeve on which there is provided corresponding first and second coupling parts for inter-engaging the first and second coupling parts on the first and second sleeve." (Patent col. 9:26–29.) As noted, Zoom Tubes does contain a connective sleeve that operates to link together two adjacent tube

9

sections. (*See* Dkt. No. 26 at 8.) But SAS argues that this sleeve lacks the requisite first and second coupling parts. (Dkt. No. 33 at 15; *see also* Vallee Decl. ¶ 35.)

As explained above, Ever Victory has identified "the left and right vertical surfaces of the projections on each [Zoom Tubes] tube section" as the first and second coupling parts described in claim 4. (Dkt. No. 26 at 5.) But it is undisputed that Zoom Tubes' connective sleeve contains no projection comparable to the projections contained on the tube sections themselves. (Vallee Decl. ¶ 35.) Instead, Ever Victory identifies the "inner and outer surfaces" of a groove cut into the connective sleeve as first and second coupling parts for purposes of this limitation. (Dkt. No. 26 at 8.) Ever Victory, however, has offered no justification for reading identical claim language (*i.e.*, "first and second coupling parts") to refer to one feature of an accused product (*i.e.*, opposite sides of a projection contained on a tube section) in the context of one claim limitation and to refer to an entirely different feature (*i.e.*, opposite sides of a groove cut into a connective piece) in the context of another claim limitation. Absent such a justification, the Court abides by the maxim that "[a] word or phrase used consistently throughout a claim should be interpreted consistently." *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998).

Here too, then, Ever Victory has fallen short of the mark by failing to demonstrate a likelihood that the Zoom Tubes product contains a third sleeve that contains the first and second coupling parts described in the '212 Patent's claim language.

\*\*\*

As explained earlier, Ever Victory's failure to demonstrate that Zoom Tubes satisfies any one of the limitations set out in claim 4 would compel the conclusion that Ever Victory has failed to demonstrate a likelihood of success on the merits of its claim that Zoom Tubes infringes claim 4 of the '212 Patent. *See Trebro Mfg.*, 748 F.3d at 1166. Because the Court has identified

10

three distinct claim limitations as to which Ever Victory has failed to carry its burden, the Court has little trouble concluding that, as to claim 4 of the '212 Patent, Ever Victory has failed to demonstrate a likelihood of success on its infringement claims.

### 2. Claim 10

Claim 10 of the '212 Patent describes a toy vehicle that contains, among other things, "at least two principal guiding members provided on the first end portion of the vehicle body." (Patent col. 10:19–21.) In arguing that Zoom Tubes satisfies this limitation, Ever Victory points to a photograph that, it claims, depicts SAS's product and that appears to show a toy vehicle with side wheels emerging from the front end. (Dkt. No. 26 at 12.) These side wheels, Ever Victory maintains, represent the "guiding members" described in the patent claim. (*Id.*)

SAS, however, has submitted a sworn declaration from its president, Scott Sobo, attesting that "SAS has never sold or offered to sell the toy car pictured" in the photograph at issue. (Dkt. No. 34 ¶ 17; *see also id.* ¶ 1.) The photograph, Sobo maintains, depicts "an early prototype car that SAS never sold or offered for sale" and appears to have been drawn from "an old video" that "was only briefly displayed on SAS's website" and has since been removed. (Dkt. No. 34 ¶ 17.) According to Sobo, the only Zoom Tubes cars that SAS *has* ever actually sold or exhibited to a retailer lack the front side wheels accused as the "guiding members." (Dkt. No. 34 ¶¶ 18–20.)

Ever Victory offers no real response. It simply reiterates that the photograph upon which it relies once appeared on SAS's website and contends, without citation to legal authority, that SAS has therefore "both s[old] and offer[ed] to sell an infringing car." (Dkt. No. 46 at 5.) This barebones assertion is insufficient to carry Ever Victory's burden of persuading the Court that the mere publication of an image of a potentially infringing product likely constitutes patent infringement under the governing law. *Cf. MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (ruling that emails describing an allegedly

infringing product to an end purchaser did not constitute an actionable offer of sale because, among other things, the emails contained no "price terms"). And other than SAS's publication of such an image, the only evidence that Ever Victory supplies in support of its claim that SAS has ever sold or offered to sell a vehicle containing the accused side wheels is—inexplicably—a printout from SAS's website showing a picture of a toy car that, as best the Court can discern, does *not* contain the side wheels. (*See id.*; Dkt. No. 47-5.) The Court therefore has little trouble concluding that Ever Victory has failed to demonstrate a sufficient likelihood that Zoom Tubes, as it has actually been sold and offered for sale, infringes claim 10 of the '212 Patent.

### 3. Claim 20

Finally, Ever Victory argues that SAS has infringed claim 20 of the '212 Patent. (Compl. ¶ 17.) But that claim also includes limitations requiring that an accused product contain

> a connection module comprising: coupling means having first and second coupling parts which are provided on the first and second tube sections respectively and are inter-engageable with each other to prevent axial separation between the first and second tube sections; and interlocking means having first and second interlocking parts which are provided on the first and second tube sections respectively and are inter-engageable with each other to fix the first and second tube sections in one predetermined angular position relative to each other selected from at least two predetermined angular positions

as well as a toy vehicle with "at least two principal guiding members provided on the first end portion of the vehicle body." (Patent col. 10:65–11:9, 12:6–8.) The Court has already concluded in connection with claims 4 and 10 that Ever Victory has failed to demonstrate that Zoom Tubes likely embodies these limitations. The Court thus concludes that Ever Victory has not shown a likelihood of success on its claim that Zoom Tubes infringes claim 20 of the '212 Patent.

### B. Irreparable Harm

That Ever Victory has failed to establish a likelihood of success on its infringement claims would alone be sufficient reason to deny its motion for a preliminary injunction. *See Amazon.com*, 239 F.3d at 1350 (noting that a movant must show a likelihood of success on the merits to obtain a preliminary injunction). But the Court notes that Ever Victory has also failed to demonstrate that it will suffer irreparable harm absent a preliminary injunction.

To establish its entitlement to a preliminary injunction, Ever Victory bears the burden of showing that it runs the risk of "substantial and immediate irreparable injury" if SAS is permitted to continue selling Zoom Tubes during the pendency of this litigation. *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). And it must further show that any such injury bears "a sufficiently strong causal nexus . . . to the alleged infringement." *Id.* In attempting to make this showing, Ever Victory points to a declaration from Tang Kwok Hung, the manager of sales and marketing for a sister company, asserting that Ever Victory's Rocket Wheels product—which is supposedly covered by the '212 Patent—accounts for around 60% of the sister company's business and that sales of SAS's Zoom Tubes product have driven down retail prices for Rocket Wheels. (Dkt. No. 25 ¶¶ 1, 5, 7, 10, 12–13; *see also* Dkt. No. 26 at 14–15.)

But the fact that a party—or its sister company—will lose income absent a preliminary injunction is insufficient to establish the sort of irreparable harm that would justify recourse to that extraordinary remedy. Rather, "the irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Thus, for example, irreversible "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Id.* Similarly, a damages remedy might not be "a meaningful one" if

13

"the financial condition of the [alleged] infringer" makes it unlikely that any such remedy would ever be satisfied. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011).

Nothing in Tang's declaration or associated deposition testimony offers the Court a reason to believe that *ex post* money damages would be insufficient to remediate any injury Ever Victory might suffer as a result of SAS's continued sale of Zoom Tubes during the pendency of this suit. Tang has not testified that the sale of Zoom Tubes has caused Ever Victory reputational injury or cost Ever Victory any specifically identified business opportunities. Nor has he implied that SAS would be unable to satisfy any monetary judgment that it might owe in the event that it is ultimately found to have infringed the '212 Patent. And although Tang has attested to Rocket Wheels' falling retail prices (Dkt. No. 25 ¶ 13), he has offered no reason to believe that this drop is irreversible, nor has he elaborated on his unsupported statement that the drop is attributable to SAS's sale of the Zoom Tubes product. Particularly given the Court's doubts that Ever Victory will ultimately prevail on the merits, this underwhelming showing of irreparable harm only bolsters the Court's conclusion that a preliminary injunction is unwarranted here.

\*\*\*

The Court concludes that Ever Victory has failed to establish either that it is likely to succeed on the merits or that it will suffer irreparable harm absent a preliminary injunction. Because these deficiencies are alone sufficient for the Court to deny Ever Victory the relief it seeks, the Court need not proceed to consider whether the balance of hardships tips in Ever Victory's favor or whether an injunction would be consistent with the public interest.

## IV. Conclusion

For the foregoing reasons, Ever Victory's motion for a preliminary injunction is DENIED. Within 21 days of the date of this order, the parties are directed to file a joint letter advising the Court of their views as to whether discovery should proceed in this matter, or

whether this case should be stayed pending a determination of the scope of Ever Victory's rights in the '212 Patent in a litigation currently proceeding in the Northern District of Illinois.

The Clerk of Court is directed to close the motion at Docket Number 22.

SO ORDERED.

Dated: September 11, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge